# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SUNIVA, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 17-108337(KG) |
| SQN ASSET SERVICING, LLC<br><br>Plaintiff,<br><br>v.<br><br>SUNIVA, INC. and LION POINT CAPITAL, LP,<br><br>Defendants. | Adversary Proceeding No. 18-____ |

**DECLARATION OF JAMES M. MODAK**

James M. Modak, being duly sworn under oath, declares as follows:

1. I am over the age of eighteen (18) years and make this Declaration of my own free will.

2. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could competently testify to those facts.

3. I hold a Bachelor degree in Business Administration/Accounting from the University of Notre Dame, which I received in 1979.

4. After graduating from Notre Dame, I spent approximately twelve (12) years working for the accounting firm KPMG Peat Marwick.

5. After leaving KPMG Peat Marwick, I spent the nearly three (3) decades as a senior financial officer (including Chief Financial Officer ("CFO") and Chief Operating Officer ("COO")) with various private and publicly traded companies.

6. I have been personally involved in three (3) public offerings, four (4) sell-side merger and acquisition transactions and more than fifty (50) buy-side merger and acquisition transactions.

7. I am currently the CFO of SQN Capital Management, LLC ("SQN Capital"), an equipment leasing and asset finance company which funds activities through managed investment funds.

8. Prior to becoming the CFO of SQN Capital, I was the CFO of Suniva, Inc., the Debtor in the above-captioned action (the "Debtor").

9. I was the CFO of the Debtor for more than eight (8) years, in the solar industry for more than ten (10) years and became very knowledgeable about the Debtor's business and the solar industry.

10. While CFO of the Debtor, I raised over $200 million of equity capital and more than $100 million in debt and government grants.

11. Given my extensive knowledge of and experience in the solar industry, I have been invited to speak at numerous solar industry research events in the last ten (10) years.

12. In the Fall of 2011, based on a petition filed by SolarWorld Americas Inc. ("SolarWorld"), the U.S. Department of Commerce ("USDOC") opened an anti-dumping counter-vailing duty ("AD/CVD") investigation into solar cells manufactured in China.

13. Shortly thereafter, manufacturers in China began changing their sourcing/manufacturing operations to have certain processes occur in Taiwan, to create a "Taiwan" country of origin on the final products and avoid tariffs. Thus, SolarWorld filed a second AD/CVD petition that targeted products from Taiwan and China. The two petitions are also known as the "CSPV 1" and "CSPV 2" cases. Importers were required to post estimated

AD/CVD cash deposits on shipments from Taiwan and China in a U.S. Treasury suspension account. The account contains well over $1 billion(US).

14. The Debtor was invited to file (and did file) comments with the USDOC regarding the AD/CVD investigations.

15. In the Fall of 2017, I was invited to participate in U.S. solar industry discussions regarding potential AD/CVD settlement and distributions. During this process I was asked for input and assistance with negotiations by several of the solar industry participants based on my knowledge of both the circumstances and personal knowledge of some of the specific people involved. In many ways, I acted as a trusted advisor and facilitator since prior discussions had resulted in no consensus for nearly two (2) years.

16. These discussions and meetings resulted in a unified U.S. solar industry settlement proposal made to the Office of the United State Trade Representative (the "USTR") in December, 2017.

17. In April 2017, the Debtor engaged Matthew J. McConkey, Esq. of Mayer Brown LLP in Washington DC as its trade counsel to assert the Debtor's petition in a Section 201 Trade Case (the "Trade Case") with the International Trade Commission ("ITC"). The Trade Case resulted in a favorable vote by the ITC and, ultimately to tariffs favorable to U.S. solar manufacturers, including the Debtor. Additionally, Mayer Brown has assisted the Debtor in establishing standing as a participant in the U.S. solar industry for the purpose of, among other things, collecting on any settlement resulting from the original AD/CVD investigation.

18. Since April 2017, I have provided extensive assistance to Attorney McConkey and the Debtor in their efforts regarding the Trade Case and to obtain a settlement from the AD/CVD investigation, which are on-going. More specifically, I personally supported the

Debtor with over 100 hours of time to assist the Debtor at no charge in preparing required questionaires, responses to inquiries on the questionaires by the ITC, preparation for testimony by Debtor personnel and trade counsel before the ITC and responses to questions from the ITC (before their determination and afterwards) based on requested exceptions to the Trade Case tariffs.

19. My assistance has included, but is not limited to, speaking with Attorney McConkey, executives from other U.S. solar market participants based on my history working with many of them and representatives of the USTR about the ability of the Debtor to obtain an AD/CVD settlement.

20. Based on such communications, as well as my prior solar industry discussions and meetings related to the AD/CVD settlement, I am aware of the fact that it is very important, if not critical, for the Debtor to maintain solar cell production capacity at its Norcross, Georgia facilities (the "Norcross Facility") in order to recover any AD/CVD settlement.

21. The purpose of any AD/CVD settlement is to compensate solar cell and panel manufacturers damaged by the prior predatory actions of solar cell and panel manufacturers located in China and Taiwan.

22. The USTR has made clear that it will not award an AD/CVD settlement to a shell company that has no solar cell or panel production capacity. This is based on my discussions with trade counsel, other market participants in the settlement discussions last year, as well as the Debtor's executive, Matt Card.

23. The removal of the existing solar cell production equipment from the Debtor's Norcross Facility would render the Debtor a shell company and jeopardize—if not completely eliminate—the Debtor's ability to recover any AD/CVD settlement.

24. Accordingly, it is vital that the Debtor continue to maintain ready-to-use solar cell production equipment at the Debtor's Norcross Facility.

25. Based on my knowledge of and years of experience in the solar industry including the multiple capacity installations while at Suniva, it would take the Debtor approximately six (6) months or more to order, ship and install new solar cell production equipment similar to the production equipment that is currently at Debtor's Norcross Facility. It is important to understand that the production of solar cells requires very complex infrastructure to ensure proper and safe distribution of chemicals and gases, some of which are toxic and highly flammable. This type of infrastructure alone can take months to build and obtain proper government reviews and approvals, many of which currently exist with SQN's equipment now in place. It is also important to note that the current solar cell equipment at the Debtor operates using the Passivated Emitter and Rear Cell ("PERC") process, which is state of the art and has only been widely adopted in the solar industry over the last few years.

26. The cost to purchase and install such equipment would range between $25 million and $50 million based on my recent discussions with an executive at a new solar company as well as a founder of one of the leading solar equipment manufacturers from Germany.

27. I am not aware of any used solar cell production equipment that is currently available for purchase and installation by the Debtor.

28. It would be difficult, expensive and time consuming for the Debtor to obtain and install solar cell production equipment of a caliber and capacity equal to SQN's solar cell production equipment that is currently at the Norcross Facility. While it is possible that the Debtor could attempt to buy and install inferior solar cell production equipment to replace SQN's

equipment, the USTR would, based on my conversions with its representatives and trade counsel, consider such efforts to be disingenuous and a sham.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2018.

James M. Modak

James M. Modak