## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )   Chapter 11 |
| | ) |
| SUNIVA, INC. [1] | )   Case No. 17-10837 (KG) |
| | ) |
| Debtor. | ) |
| | ) |
| SQN ASSET SERVICING, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   Adv. Pro. No. 18-50687 (KG) |
| | ) |
| SUNIVA, INC. and LION POINT CAPITAL, LP | ) |
| | )   **Re:  Adv. Docket Nos. 1, 2 & 3** |
| Defendants. | ) |
| | ) |
| | ) |

## OBJECTION OF SUNIVA, INC. AND LION POINT CAPITAL, L.P.
## TO MOTION FOR EMERGENCY AND PRELIMINARY INJUNCTIVE RELIEF

Suniva, Inc., as debtor and debtor in possession (the "<u>Debtor</u>"), and Lion Point Capital,

L.P. ("<u>Lion Point</u>"), hereby jointly submit this objection to the temporary restraining order[2]

sought in the *Verified Adversary Complaint for Emergency and Preliminary Injunctive Relief*,

Adv. No. 18-50687-KG, ECF No. 1, (the "<u>Complaint</u>"), the *Motion for Emergency and*

*Preliminary Injunctive Relief*, Adv. No. 18-50687-KG, ECF No. 2 (the "<u>Motion</u>") and the

*Memorandum of Law in Support of Motion for Emergency and Preliminary Injunctive Relief*,

---

[1]    The last four digits of the Debtor's federal tax identification number is 2418.  The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd, Norcross, Georgia 30092.

[2]    Although SQN seeks both a temporary restraining order and a preliminary injunction in its Complaint and Motion, the Debtor and Lion Point understand that the Court will consider only the proposed temporary restraining order at the hearing scheduled for August 15, 2018.  Accordingly, this objection addresses only the requested temporary restraining order.  The Debtor and Lion Point intend to address SQN's request for a preliminary injunction in subsequent pleadings following the opportunity for discovery, including the taking of depositions and review of documents to be produced by SQN.

Adv. No. 18-50687-KG, ECF No. 3 (the "<u>Memorandum</u>") filed by SQN Asset Servicing, LLC ("<u>SQN</u>").[3]

## <u>PRELIMINARY STATEMENT</u>

1.    In brazen and illogical desperation, SQN comes to this Court seeking unprecedented relief from the consequences of its own actions.  Specifically, SQN demands a temporary restraining order prohibiting the Debtor from *filing* a dispossessory proceeding under Georgia law that, if successful, would require SQN to remove its property (the "<u>SQN Equipment</u>") currently housed at the Debtor's expense in the Debtor's leased facility in Norcross, Georgia (the "<u>Norcross Facility</u>").  In addition, SQN seeks to prevent the Debtor from actually *removing* the SQN Equipment in the event the Georgia court determines it may be removed. SQN disingenuously and incorrectly argues that removing the SQN Equipment would have a "significant adverse effect on the Debtor's ability to recover the AD/CVD settlement." Memorandum at 10.  This assertion is not only wrong, it is completely belied by SQN's own conduct in this case:

- SQN chose to stop funding the SQN-Lion Point debtor-in-possession financing agreement that would have provided funds for the Debtor to continue funding operations and pursue the AD/CVD settlement;[4]

- Only Lion Point stepped up to provide $1.9 million in funding to pursue the AD/CVD settlement efforts and otherwise avoid a liquidation that could have harmed the Debtor's efforts to participate in the settlement;[5]

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint, the Motion or the Memorandum, as applicable.

[4]    *See* Mot. of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362, No. 17-10837-KG, ECF No. 596.

2

- SQN instead chose to seek and obtain relief from the automatic stay to foreclose on its collateral, including the SQN Equipment;[6]

- SQN attempted to sell the SQN Equipment to numerous third parties (the direct effect of which would have been to deprive the estate of the very equipment SQN now contends is so critical to an AD/CVD recovery) but was unable to find any willing buyers and consequently foreclosed on the property;[7]

- Following the foreclosure sale, SQN issued a press release saying that the "manufacturing capacity of Suniva [has] been acquired by SQN and [has] been released from the bankruptcy process and plans are in process to restart operations as soon as possible;"[8]

- Even after the foreclosure sale, SQN attempted unsuccessfully to sell the SQN Equipment to other third parties, including Lion Point; and

- SQN sought to take over the Norcross Facility lease,[9] which would have resulted in both the SQN Equipment and the lease being held outside of

---

[5]    *See* Final Order Authorizing Secured Post-Pet. Financing Pursuant to 11 U.S.C. § 364, No. 17-10837-KG, ECF No. 702 (the "Lion Point DIP Order") (describing the need for the Lion Point DIP financing in the absence of any other sources of funding after the exhaustion of the SQN DIP financing). Instead, Lion Point has committed up to $1.9 million under the Lion Point DIP to fund ongoing operations; it has expended another $500,000 to fund rent for the Norcross Facility for the same purpose. If Lion Point wanted to work against the AD/CVD recovery, all it had to do would be to *not* continue funding, particularly the additional $500,000 which was provided *without recourse* to the Debtor. The Committee and Debtor, the only fiduciaries of the estate in this case, have independently considered and supported Lion Point's efforts as the best way to maximize value for the estate.

[6]    *See* Order Granting Mot. of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362, No. 17-10837-KG, ECF No. 635.

[7]    *See, e.g.*, Auction Proceedings Transcript, Article 9 Sale—Suniva, Inc., Ref 117502, May 24, 2018 (the "Auction Transcript").

[8]    *See* Exhibit C to Debtor's Norcross Stipulation Reply, *SQN Capital Management Prepared to Revitalize Suniva*, P.R. Newswire, Jun. 14, 2018, No. 17-10837-KG, ECF No. 794-3 (the "Press Release").

[9]    *See* Letter from Jeremiah Silkowski to David M. Baker re: Suniva, Inc.—AD/CVD Settlement dated August 6, 2018, No. 18-50687-KG, ECF No. 1-3 at 2 (the "Silkowski Letter").

IMPAC 5894938v.1

the estate, but was unable to reach a deal with the Norcross Facility landlord.[10]

2.      Now having failed in its efforts to sell the SQN Equipment and take over the Norcross lease, SQN asks this Court to save itself from its own conduct.  If SQN truly believed that removal of the SQN Equipment from the reach of the estate would significantly and adversely affect the prospects of obtaining AD/CVD settlement proceeds, why did it make every effort to foreclose on the SQN Equipment, sell it to third parties and take over the lease?  And why did it not continue funding the estate to avoid liquidation?  The Complaint can only be explained as a last-ditch effort to gain some leverage against the Debtor, forcing the Debtor to house the SQN Equipment at the Debtor's expense, presumably with a hope of imposing unreasonable conditions on the use or sale of the SQN Equipment.[11]  In contrast, the estate's only fiduciaries—the Debtor and the unsecured creditors' committee (the "Committee")—have determined that removal of the SQN Equipment is an appropriate exercise of the Debtor's business judgment.

3.      For the reasons summarized above, the Motion is absurd on its face and should be denied by the Court.  Most immediately, SQN is seeking a temporary restraining order (a "TRO") to prohibit the Debtor and Lion Point from (1) merely filing of a dispossessory proceeding under state law (a "State Court Action"), and (2) removing the SQN Equipment if the Georgia court rules in favor of the Debtor in the State Court Action.[12]  TROs and preliminary

---

[10]     *See* Email dated July 20, 2018 re: Suniva Inc. 17-10837-KG from Rachel B. Mersky to Douglas J. Lipke, No. 17-10837-KG, ECF No. 794-1 (the "Mersky Email").

[11]     Given the history of this case, SQN's apparent attempt to leverage its position for its own advantage should come as no surprise.  See Letter to Legal Service Department, China Chamber of Commerce for Import & Export of Machinery & Electronic Products, dated May 3, 2017, No. 17-10837-KG, ECF 794-2.

[12]     It is unclear why Lion Point is named at all in the Complaint, since it can neither remove SQN's equipment nor commence a State Court Action to do so.

injunctions are forms of emergency relief that are meant to be used only when there is some danger of immediate and irreparable harm to an aggrieved party.  Other than making the bare statement during a telephonic Chambers conference that it wants to enjoin the Debtor from filing a complaint, SQN has not said a single word in its pleading or otherwise to support the issuance of a TRO to prohibit the Debtor's filing of a complaint, much less come close to meeting the high standard for immediate injunctive relief.[13]

4.      Not only has SQN failed to support its absurd assertion that the mere filing of a State Court Action would cause it some irreparable harm (it is axiomatic that the filing of a complaint does nothing to disrupt the status quo), it has also not made a showing of any of the other factors necessary for injunctive relief to be granted.  Obviously, any State Court Action would give SQN the opportunity to appear and present its objections to removal of its equipment from the Norcross Facility.  Because Suniva does not intend to remove the SQN Equipment cannot take place until the removal proceeding is commenced and adjudicated by a Georgia court, the TRO is also entirely unwarranted to prohibit the Debtor from removing the equipment. Moreover, as will be demonstrated at the preliminary injunction stage, SQN is not entitled to an injunction against removal of the SQN Equipment because such removal will not harm SQN, let alone irreparably harm SQN, in any legally cognizable way.

**A.      SQN FAILS TO STATE THE APPROPRIATE STANDARD FOR INJUNCTIVE RELIEF, LET ALONE MEET IT**

5.      The four factors that courts consider in determining whether to grant a TRO or a temporary injunction are:  "(1) the likelihood that the moving party will succeed on the merits;

---

[13]      The proposed temporary restraining order, by its terms, only prevents the Debtor from "removing, directly or indirectly, through the filing of eviction proceedings or otherwise" the SQN Equipment.  While it does not expressly preclude the Debtor from filing a dispossessory proceeding, during a Chambers conference on August 10, 2018 concerning scheduling issues, SQN clarified it is seeking an injunction against the filing of the dispossessory complaint itself, and not just the removal of SQN Equipment following the conclusion of the proceeding.

IMPAC 5894938v.1

(2) the extent to which the moving party will suffer irreparable harm without injunctive relief;

(3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is

issued; and (4) the public interest." *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.*, 562 F.3d

553, 556 (3d Cir. 2009) (citation omitted).

6.       Contrary to SQN's assertion, allegedly based on inapposite out-of-circuit

authority, that the four factors should be "balanced," see Memorandum at 8, this Court has stated

that "the failure to meet *any one of the factors* compels denial of the motion." *In re Venoco,*

*LLC*, 572 B.R. 105, 113 (Bankr. D. Del. 2017) (emphasis added), citing *NutraSweet Co. v. Vit–*

*Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("A plaintiff's failure to establish any

element in its favor renders a preliminary injunction inappropriate.").   The Third Circuit has

recently clarified that "a movant . . . must meet the threshold for the first two 'most critical'

factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to

suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*,

858 F.3d 173, 179 (3d Cir. 2017), as amended (June 26, 2017) (quoting *Nken v. Holder*,

556 U.S. 418, 434 (2009)).  SQN has not successfully pled *any* of the factors necessary for the

granting of such extraordinary relief it seeks, and so such relief should be summarily denied.

**B.       SQN ASSERTS NO LEGITIMATE BASIS ON WHICH TO ENJOIN THE DEBTOR FROM FILING A STATE COURT ACTION SEEKING REMOVAL OF NON-DEBTOR PROPERTY AND FROM REMOVING NON-DEBTOR PROPERTY FROM ITS NORCROSS FACILITY**

7.       SQN has failed to allege any grounds on which this Court should grant a TRO or

preliminary injunction preventing the Debtor from filing a State Court Action.  Indeed, granting

such relief would be an unprecedented use of a preliminary injunction, the purpose of which is to

"maintain the status quo" in advance of a full hearing on the merits, *Best Foods v. Hemphill*

*Packing Co.*, 295 F. 425 (D. Del. 1924), and of a TRO, the purpose of which is to "preserv[e] the

status quo [in advance of a] hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974). Neither is designed to prevent the *commencement* of an action in a proper forum.

            i.     *SQN Has Shown No Likelihood of Success on The Merits*

8.      It is axiomatic that the Bankruptcy Court's "equity power granted under § 105 must stem from another provision of the Code." *In re Phar-Mor, Inc. Sec. Litig.*, 166 B.R. 57, 61 (W.D. Pa. 1994); see also *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir.1992) (Section 105 does not "create substantive rights that would otherwise be unavailable under the Code") (citation omitted). Although SQN asks this Court to grant its Motion on the basis of § 105(a) of the Bankruptcy Code, see Complaint ¶¶ 41-51, it fails to identify any substantive provision of the Bankruptcy Code on which this Court can rely in invoking its § 105(a) powers.

9.      The only substantive provision on which SQN could conceivably be asking this Court to rely is § 363(b), which it cites to only once and not in support of the relief it seeks, but rather as a purported source of its objection to the removal of the SQN Equipment through a State Court Action. Even for this purpose, § 363(b) is inapposite, as that provision explicitly concerns "property of the estate." The SQN Equipment ceased to be property of the estate when SQN completed its foreclosure action. Because the equipment no longer belongs to the estate, the Debtor and Lion Point respectfully submit that Bankruptcy Court approval is not required to remove it from the Debtor's facility. However, to the extent that removal does require Bankruptcy Court approval, the standard that should be applied by this Court is whether the Debtor's action is a reflection of its reasonable business judgment. Here, the Debtor has

determined, in the exercise of its reasonable business judgment, and based upon the advice of outside advisors, that removal of the equipment is in the best interest of the estate.[14]

10.    Although necessarily premature for the Court's consideration at this stage because it would not occur until after an appropriate order or a writ of possession is issued in the State Court Action, SQN has also failed to assert any likelihood of success on the merits with respect to its claims relating to the removal of the SQN Equipment itself.  Like the commencement of an action to remove non-Debtor property from the Norcross Facility, the actual removal of the equipment is well within the Debtor's reasonable business judgment.  As it is not currently operating, the Debtor has no present use for the equipment, which it does not own and cannot use without further contractual arrangements with SQN.[15]  To date, SQN has not extended any offer to allow the Debtor to use the equipment and absent such agreement the equipment has no value to the estate.  In fact, the presence of the equipment only imposes costs and liabilities on the estate (as does the Motion).  In addition, although the Complaint includes a misrepresentation that SQN has "offered to pay certain expenses (up to $80,692 per month, including insurance)," see Complaint ¶ 38, SQN's actual proposal required that such payment be structured *as a loan* to

---

[14]    Notably, the Complaint mischaracterizes the Debtor's letter concerning the timeline by which the Debtor requires that SQN remove its property from the Norcross Facility.  *See* Letter from Colin M. Bernardino to Douglas J. Lipke re: Demand for Possession—5765 & 5775 Peachtree Industrial Boulevard, Norcross, Georgia 3009 dated August 2, 2018, Adv. No. 18-50687-KG, ECF No. 1-2 at 1 (the "<u>Demand Letter</u>").  The Complaint states that "[i]n the event that SQN does not *remove its solar cell production line equipment* from the Norcross Facility on or before August 16, 2018, the Debtor has threatened to file eviction proceedings against SQN to forcibly remove the equipment for the Norcross Facility."  Complaint ¶ 32 (emphasis added).  In fact, the Demand Letter demands that "SQN . . . *execute a binding agreement* with Suniva to remove the Non-Debtor Property, and *begin to remove* such Non-Debtor Property, from the [Norcross] Facility by August 16."  *See* Demand Letter at 1 (emphasis added).

[15]    Although further contractual negotiations with SQN could lead to a scenario where the equipment could be used by the Debtor, the costs of such arrangements would outweigh their benefit. Even if such arrangements existed, the Debtor's landlord has made clear that it does not want SQN to have any relationship going forward. Accordingly, removing SQN's equipment from the Norcross Facility is part of an effort to lay the groundwork for a good relationship with the landlord that will allow the Norcross Facility to be operational in the future.  *See* Mersky Email (stating in no uncertain terms that the landlord was "not interested in further lease discussions with SQN" and would seek exercise its rights with respect to eviction of the SQN equipment if SQN did not take steps to remove it).

be repaid,[16] leaving the ultimate cost of housing the SQN Equipment with the Debtor.  Further, the proposed amount is insufficient to cover all of the costs, despite the fact that the Debtor does not own or have any right to use the SQN Equipment.

11.     Moreover, it is unclear when (if ever) the Debtor may achieve an AD/CVD settlement.  It is entirely possible (and even likely) that by such time, the SQN Equipment will be even more outdated than it already is, given how quickly technological advances occur in the solar cell manufacturing industry.  Indeed, contrary to SQN's assertion that its equipment is "state of the art,"[17] the equipment in fact has an established market value of zero.  SQN attempted to sell the property at a foreclosure auction and received no bids for it,[18] and further post-auction attempts to sell the property have not resulted in sales.  To indefinitely store unusable equipment that has zero market value and incur substantial maintenance and insurance costs is clearly a bad business proposition for the Debtor.

12.     Further, contrary to SQN's misrepresentations, the Debtor has not "admitted" that storing SQN's equipment is a necessary prerequisite for receipt of the AD/CVD settlement funds.  In fact, the Debtor has stated the exact opposite—specifically, the Debtor stated that it "does not believe that the foreclosure or dispossession of the equipment has a significant adverse effect on the opportunity to receive AD/CVD settlement proceeds as long as the Debtor *has, or can obtain, equipment to restart production in the future.*"[19]  Trying to make its point, SQN focuses on language in a footnote but glosses over language in the actual quote and omits key language from the same footnote that makes it clear that "the Debtor may in the future obtain

---

[16]     Silkowski Letter at 1.

[17]     *See* Decl. of James M. Modak at ¶ 25, Adv. No. 18-50687-KG, ECF No. 3-2.

[18]     Auction Transcript, at 31, 33-34.

[19]     Debtor's Reply in Supp. of Mot. of Debtor for Entry of an Order (I) Approving the Stipulation Regarding Norcross, Georgia Lease, and (II) Extending Debtor's Time, With Consent, to Assume or Reject Norcross, Georgia Lease, No. 17-10837-KG, ECF No. 794 (the "Debtor's Norcross Stipulation Reply").

IMPAC 5894938v.1

alternative equipment, as is customary in a fast-moving industry like solar cell manufacturing."[20] As noted above, the time horizon for the AD/CVD settlement, to the extent that it ever comes to fruition, is easily a matter of years rather than months.  There is no reason to think that the SQN Equipment would be the right choice for the Debtor at the time the Debtor restarts operations.  At that time, the appropriate equipment could be purchased or obtained through arrangements with other industry players.  Moreover, having a warehouse full of equipment without the right to use it would be at least as likely to be detrimental to the Debtor's chance of obtaining an AD/CVD recovery than having a warehouse that stands ready to be filled with purchased or leased equipment at the right moment.

13.     Finally, SQN makes unsupported claims that there was an "understanding" that the SQN Equipment would remain at the Norcross Facility.  This is false.  SQN cites no evidence supporting such a statement for the simple reason that none exists.  Nothing in the stipulation between the Debtor, the Committee, Lion Point and SQN relating to advances by Lion Point to the Debtor in May of 2018,[21] or the record, remotely suggests that the parties had such an "understanding."  In fact, the LP Advance Stipulation explicitly contemplates that the property could be removed after June 1, 2018 if SQN ceased paying rent on the Norcross Facility, which it did in fact stop paying.[22]  And certainly, SQN's own conduct shows a desire to remove the SQN Equipment and the lease from the reach of the estate.

---

[20]     *Id.*

[21]     *See* Stipulation by and Among the Debtor, the Official Committee of Unsecured Creditors, Lion Point Capital, LP, and SQN Asset Servicing, LLC, No. 17-10837-KG, ECF No. 665-3 (the "LP Advance Stipulation").

[22]     The LP Advance Stipulation also makes clear that, regardless of SQN's payment of rent for June and July, there would be no restriction on the Debtor's right to seek removal of the equipment after July 31, 2018.

      *ii.*     *No Irreparable Harm Will Come To SQN if the State Court Action is Filed and the SQN Equipment is Removed*

14.     SQN has not demonstrated *any* harm that will come to it if this Court does not issue a TRO or preliminary injunction enjoining the filing of a State Court Action, let alone *irreparable harm*. As noted above, if SQN opted to litigate rather than remove its equipment from the Norcross Facility, it would have a full and fair opportunity to object in the State Court Action.

15.     Although Suniva does not intend to remove the SQN Equipment until an order is issued in the State Court Action, and this Court need not consider arguments relating to the actual removal of the equipment at this time, it is worth noting that SQN has also failed to assert any basis on which it will be irreparably harmed by the removal of the equipment. SQN elected to foreclose on its equipment, and attempted to sell it to other buyers in the industry. When that was unsuccessful, SQN attempted to sell the equipment to Lion Point, at a price that would necessarily have been far above its nonexistent market value.[23] SQN also attempted to take over the Debtor's lease, although the landlord was not interested, as it acknowledged in a letter it attached to its Complaint.[24] Thus, any resulting "harm" to SQN is entirely due to its own actions.

16.     Although tangential to the injunctive relief factors germane to the relief sought by SQN, SQN asks this court to speculate that Lion Point may be seeking to scuttle competition or the AD/CVD settlement. This allegation is laughable given that (i) Lion Point is funding $1.9 million in debtor-in-possession financing and has paid $500,000 to extend the Norcross Facility lease on a non-recourse basis; (ii) SQN refused to extend financing under the prior

---

[23]    Lion Point responded to this offer with a counteroffer, which was not accepted.

[24]    *See* Silkowski Letter at 3 (stating "SQN has repeatedly expressed interest in assuming the lease for the Norcross [F]acility directly.").

IMPAC 5894938v.1

debtor-in-possession financing to continue the pursuit of the AD/CVD funds; (iii) absent Lion

Point's funding, Suniva would have been forced into liquidation, which would likely have an

adverse effect on the estate's ability to obtain AD/CVD funds; (iv) the Committee and Debtor,

the only fiduciaries of the estate in this case, have independently considered and supported Lion

Point's efforts as the best way to maximize value for the estate; and (v) SQN's motivations are

highly suspect, given that it is a competitor of Suniva attempting to "restart operations as soon as

possible."[25]

17.    Furthermore, where a later equitable remedy or an award of damages will provide

an adequate remedy, irreparable harm has not been established and an injunction is not

appropriate except in extraordinary circumstances.  See *Reilly*, 858 F.3d at 179 n.4 (stating that

"the availability of money damages for an injury typically will preclude a finding of irreparable

harm"); *Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109-VCP, 2010 WL 1223782, at *4

(Del. Ch. Mar. 24, 2010); *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005)

("Where there is an adequate remedy at law, such as an award of money damages, injunctions

are unavailable except in extraordinary circumstances.").[26]  The potential impact of denying

SQN's request for relief is limited to the cost of removing the SQN Equipment, which

categorically fails to rise to the level of irreparable harm.

> iii.    *The Significant Potential Harm to the Debtor Weighs In Favor of*
> *Denying The Relief Sought By SQN*

18.    SQN has not even remotely established that the balancing of the harms tips in

favor of granting a TRO.  As discussed above, there is absolutely no harm, let alone irreparable

---

[25]        Press Release at 1.

[26]        *See* also *In re Bella Vista Assocs.*, No. 07-18134/JHW, 2007 WL 4555891, at *10 (Bankr. D.N.J. Dec. 18, 2007) (stating that the irreparable harm requirement is met where a plaintiff "demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages" such as a threat to real property, citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000)).

harm, that would come to SQN by the mere commencement of a State Court Action. As to the removal of the SQN Equipment itself, as noted above, the only conceivable harm that could come to SQN would be that it would have to bear the cost of removal. It is in no way an inequitable result to force SQN to pay the costs of removing *its own equipment* from the Norcross Facility. This is merely the obvious and foreseeable result of SQN's own actions in foreclosing on the SQN Equipment.

19.     SQN attempts to argue that (i) removing the SQN Equipment would be disruptive to the Debtor's ability to recover the AD/CVD settlement proceeds and (ii) there would be no adverse effect on the estate if a TRO and preliminary injunction are put in place. Memorandum at 10-11. Both of these assertions are untrue. In support of its first assertion, SQN mischaracterizes footnote text in claiming that the Debtor has changed its position on whether retaining the SQN Equipment is critical to maintaining its eligibility for the AD/CVD funds. As discussed above, the Debtor and Lion Point have never taken the position that the SQN Equipment is critical to the receipt of AD/CVD settlement funds. Regarding SQN's second assertion, it is manifestly untrue that no harm to the estate would result from enjoining Debtor's ability to pursue the State Court Action. The Debtor is permitted, as any entity would be, to exercise its business judgment and seek to have property owned by another party removed from its own leased facilities. Any delay or denial of the Debtor's right to commence the State Court Action would be prejudicial to the Debtor because it would extend the timeline for removal and increase the associated costs and liabilities incurred by the estate, while hamstringing the Debtor's ability to use its production facility as it sees fit.[27] Both of the

---

[27]     As stated elsewhere, one likely path to the AD/CVD funds is for the Debtor to acquire other manufacturing equipment at some future date, which would be difficult or impossible if the SQN Equipment continues to occupy the Debtor's manufacturing facility.

foregoing are distinct adverse effects that far outweigh SQN's specious claim that it would be irreparably harmed by the filing of a State Court Action.

20.    As discussed above, the situation before the Court exists only because of actions taken by SQN.  Had SQN succeeded in its attempts to sell the SQN Equipment and taken over the lease, the Debtor would have lost both the SQN Equipment and the Norcross Facility, resulting in the very harm that SQN claims that it is now desperate to avoid.  SQN makes much of the fact that it offered to pay $80,000 each month to cover the costs of housing the SQN Equipment, but fails to mention a number of relevant facts, including that: (i) SQN ceased funding its own debtor-in-possession financing which would have funded the Debtor's continued operations; (ii) SQN has offered to fund the $80,000 *through a loan*, not a payment as it states in its pleadings; (iii) the proffered amount would not have fully covered the costs of housing the SQN Equipment; (iv) history has shown SQN to be so recalcitrant in negotiations that the Debtor would not be well advised to attempt to negotiate in this context; and (v) SQN did not propose an agreement by which the Debtor would obtain rights to use the SQN Equipment, which would have to be separately negotiated and would presumably be costly and more trouble than it would be worth.

21.    It should also be noted that SQN, as a secured lender to the Debtor, is not an estate fiduciary and given its conduct in this case, has little credibility to argue that the actions taken by the Debtor are not in the best interest of the estate.  In contrast, the Debtor and the Committee, the only estate fiduciaries, have considered the issue and determined that removing SQN's equipment would be in the best interest of the estate.  Accordingly, the Court should not allow the unfounded assertions by SQN to serve as a basis for questioning the Debtor's business judgment.  See *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (a

IMPAC 5894938v.1

party's view that the Debtor's decision is unwise as to what is in the best interests of creditors and other parties "is insufficient as a matter of law to deny the exercise of [the debtor's] business judgment . . .").  It is well settled that courts give substantial deference to the Debtor's business judgment.

> iv.     No Public Interest Would be Served By Granting Injunctive Relief

22.     The final factor in the four-factor analysis concerns whether the public interest "favors" the relief sought.  It is manifestly clear that the public interest in conservation of judicial resources and the orderly dispatch of justice far outweighs any private interest of SQN in being protected from private litigation.  The public interest clearly favors allowing the Debtor to seek to vindicate its legal rights through a State Court Action, particularly where the mere filing of the State Court Action would have no impact on the status quo.

**C.     THE DEBTOR AND LION POINT RESERVE ALL OF THEIR RIGHTS WITH RESPECT TO SQN'S BREACHES OF ITS CONFIDENTIALITY OBLIGATIONS**

23.     In the declaration attached to the Memorandum (the "Modak Declaration"), James Modak, CEO of SQN Capital Management, LLC, reveals the details of certain advice he was allegedly given by and conversations he allegedly had with (i) Matthew J. McConkey, the Debtor's counsel in the Trade Case before the ITC, (ii) Matt Card, the Debtor's Executive Vice President for Commercial Operations and (iii) the United States Trade Representative, see Modak Declaration at ¶¶ 17- 28, Adv. No. 18-50687-KG, ECF No. 3-2.  Setting aside the purported veracity of these statements (many of which the Debtor and Lion Point vehemently dispute), disclosing such information violates SQN's confidentiality obligations, particularly where such information is subject to the common interest privilege.  Accordingly, the Debtor and Lion Point reserve all of their rights with respect to such disclosures (including the right to seek monetary damages) and intend to file a motion for a temporary restraining order and preliminary

injunction as soon as practicable that would seek to enjoin SQN from any further breaches of its

confidentiality obligations.

## <u>CONCLUSION</u>

Because SQN does not meet the high standard for injunctive relief, the Debtor and Lion

Point respectfully request that this Court (i) deny SQN's Motion with respect to the TRO and (ii)

grant any other and further relief that it deems just and proper.

Dated: August 14, 2018
       Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street, Sixth Floor
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers, Esq.
Colin M. Bernardino, Esq.
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

*Counsel to the Debtor and Debtor in Possession*

IMPAC 5894938v.1

Dated: August 14, 2018
      Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Ricardo Palacio*
Ricardo Palacio (DE Bra No. 3765)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
Sean A. O'Neal (admitted *pro hac vice*)
Jane VanLare (admitted *pro hac vice*)
One Liberty Plaza
New York, NY  10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for Lion Point*

IMPAC 5894938v.1